Brackett *v.* Middlesex Banking Co.

ANNA J. BRACKETT ET AL. *vs.* THE MIDDLESEX BANKING
COMPANY.

* Third Judicial District, New Haven, June Term, 1915.
THAYER, RORABACK, WHEELER, BEACH and BENNETT, Js.

As a general rule the receivers of a corporation take its assets burdened
with all valid outstanding liens and equities.

The custodian and trustee of collateral deposited with it as security
for the payment of the debentures issued by a corporation which
has since become insolvent, is entitled to retain, collect and ad-
minister such collateral, pursuant to the terms of the trust agree-
ment, as against the receivers of the insolvent corporation. Such
collateral constitutes a trust fund which cannot be taken from the
possession and control of the trustee in violation of the trust
agreement.

In the present case the Middlesex Banking Company issued its de-
benture-bonds which it sold to the public, and to secure their
payment deposited with a trust company, as trustee, western and
southern farm mortgages. Each debenture-bond recited that it
was issued under and subject to the provisions of an agreement
of a given date between the debtor and the trust company and that
it was secured by certain collateral deposited with the latter
company as trustee. The trust agreement provided, in substance,
that upon a default in the payment of interest or principal, the
trustee should sell the collateral, but at not less than its face value
except with the consent of the debtor, and that if not sold the
trustee should "proceed to collect" it "in such manner as it shall
deem best for the interest" of the holders of the debenture-bonds,
and apply the net proceeds to their payment, returning the sur-
plus, if any, to the debtor. After a number of years the directors
of the Middlesex Banking Company voted to go into liquidation,
receivers were appointed, and upon their application and that of
the trustee, an order of court was passed which, among other
things, provided that the receivers and not the trustee should
collect the collateral for the benefit of the debenture-holders;
that the trustee should not record the assignments of the mort-
gages which were given to it by the Banking Company; that the
receivers might make substitutions in the collateral at their dis-
cretion; and that they might charge against the proceeds of the
collateral their expenses and a reasonable sum for their services,

* Transferred from first judicial district.

Brackett *v.* Middlesex Banking Co.

and pay over the balance to the trustee. *Held* that the order was erroneous and prejudicial, since it impaired the contract created by the trust agreement; and that it was probably in contravention of the constitutional provision requiring "due process" of law, in so far as absent and unwarned debenture-holders were concerned.

The trial court was of the opinion that the mortgage collateral could be more efficiently and economically collected and administered by the receivers through the organization built up and perfected by the Middlesex Banking Company than by the trustee. *Held* that there was no reason why the trustee might not avail itself of this organization, nor why the trial court should not authorize and direct the receivers to turn that organization over to the trustee if its use would be of benefit in making the necessary collections.

The receivers contended that the "default" which authorized the trustee to administer the collateral, was one which must occur while the Middlesex Banking Company was a going concern, and that the trust agreement had no reference to a default after insolvency. *Held:*—

1. That the agreement was not susceptible of such a narrow construction; and that in view of its broad provisions there was no occasion to specify whether the default referred to was that of a going or of an insolvent concern.

2. That the trustee having been authorized to collect the collateral "in such manner as it may deem best" for the interest of the debenture-holders, had the right to compromise claims according to its sound judgment while acting with due care and in good faith.

The appointment of receivers does not terminate a trust unless the trust agreement so provides.

A court of equity may restrain an abuse of power by a trustee, but it cannot control his exercise of the legal discretion vested in him by the trust agreement.

'Argued June 9th—decided July 27th, 1915.

APPLICATIONS by two trust companies acting as trustees of collateral placed in their hands to secure outstanding obligations of the Middlesex Banking Company, and a like application by the receivers of the last-named company, praying for an order defining and determining the relative rights of the receivers and of said trust companies in and to said collateral, and as to how and by whom such collateral should be collected and administered, brought to and heard by the

Superior Court in Middlesex County, *Gager, J.;* facts found and decree passed authorizing the collection and administration of such collateral by the receivers, from which the respective trust companies appealed. *Error and cause remanded with direction to render judgment in favor of the trust companies.*

The Middlesex Banking Company loaned funds on mortgage on western farm lands, which in different forms were sold to investors. The most common form of these investments was to issue and sell the notes of the Banking Company, called debenture-bonds, the payment of which was secured by the deposit with a trust company of mortgages, accompanied by an assignment of them to the trust company under a trust agreement, and these were substantially similar in form. The collateral so deposited was arranged in series of from $25,000 to $100,000, and each group was separate from the other, and, under an independent trust agreement, was pledged for the payment only of the debentures issued against the collateral of this group. There are in force fifteen of these collateral trust agreements. Twelve of these were made originally with the Columbia Trust Company, and upon its dissolution the Middletown Trust Company was appointed by the Superior Court trustee in its stead. Two of these agreements were made directly with the Middletown Trust Company, and one with the Security Trust Company, under its then name of Security Company.

Each debenture-bond recited that it was one of a series of bonds of like form and tenor issued by the Middlesex Banking Company under and subject to the provisions of the trust agreement of a named date between the Banking Company and the trust company, and secured by certain collateral deposited under this agreement with the trust company as trustee. Upon

Brackett *v.* Middlesex Banking Co.

the bond the trust company certified its number and series, and that the collateral so deposited with it was equal to the bonds certified to under the trust agreement.

Under these agreements the trust companies were not to record the assignments except upon default, the provision in reference to which, in the Columbia Trust Company and the Security Trust Company agreements, appears in the footnote, together with other provisions relevant to the present controversy.

"A failure to pay any installment of interest due by the terms of any bond, or any portion of the principal thereof, when due, continuing for ninety (90) days after written notice served by mail postpaid or otherwise, on said Banking Company by the shall constitute a default on the part of said Banking Company within the terms and meaning of this agreement, and the whole of the series to which said bond belongs shall thereupon become due, and said may sell at public or private sale, the whole or any part of the collateral deposited with it for the series to which such bond belongs; but no sale thereof shall be made at a less rate than the face value with accrued interest of said collateral except upon the written consent of said Banking Company, its successors or assigns; and in case said shall fail to make such sale on the aforesaid terms, it shall proceed to collect such collateral in such manner as it shall deem best for the interest of the holders of the bonds of said series; and the proceeds of such sale or collection, after meeting the reasonable expenses thereof, including reasonable charges of the said for its services in such sale or collection, shall be applied in payment of the unpaid interest and principal of said series of bonds, ratably and without preference or priority in favor of any bond of said series as against any other bond of said series, the surplus, if any, to be delivered to the said Banking Company, its successors or assigns.

"The notice to the Banking Company in this section provided to be given, shall be given by said within ten (10) days after written request by the lawful holder of any bond secured by this agreement, or coupon thereof, which has been presented for payment and remains unpaid."

"Whenever said Banking Company shall make default in the payment of the principal or interest of any bond, it shall, at the request of said , forthwith deliver to the said all abstracts of title and all other papers in its possession or under its control relating to the collateral deposited with said

Brackett *v.* Middlesex Banking Co.

The Middlesex Banking Company some years ago took over on foreclosure a large acreage in the west and south. In order to liberate the sums so invested in these lands it organized the Realty Investment Company, sold it these lands, took in payment mortgages for the full value of the lands, and deposited these mortgages with a trust company to secure payment of its own debenture-bonds which it sold to the public, the method being as already described. About sixty per cent of the collateral now held by the Middletown Trust Company consists of these mortgages. The Banking Company also holds as trustee a large amount of mortgages of the Realty Investment Company as

---

for the series of bonds to which such defaulted bond shall belong; but until such default only the notes, bonds, assignments, mortgages and deeds of trust hereby guaranteed by said Banking Company to be first liens on real estate shall be deposited with said      as collateral for any series of bonds."

The provision in reference to default in the Middletown Trust Company agreement was as follows:—

"If the Banking Company shall fail to pay any matured bond, contract, or coupon, secured hereunder, within ten days after proper presentation and demand for payment, according to the terms thereof, or shall fail to perform any of the obligations imposed upon it by the terms of any bond, contract, or coupon, so issued, or by the terms of this Agreement, such failure on the part of the Banking Company shall constitute a default.

"Upon any such default of payment by the Banking Company under the terms of this Agreement, the Trustee may at its option, call upon the Banking Company for all Abstracts of Title, and other papers, relating to the collateral held by it under this Agreement, and may sell all, or any part thereof, or make such other disposition thereof for the benefit of the holders of those outstanding bonds or contracts under which the default occurred, as in its judgment will yield the best results to the holders of such bonds or contracts; but no such sale or other disposition of collateral shall be made except after ten days' notice, in writing, to the Banking Company."

The agreements also provided:—

"Any collateral deposited with said      by said Banking Company under this agreement may at any time be withdrawn by said Banking Company on its depositing with said other collateral in substitution for and equal in amount to the collateral

Brackett *v.* Middlesex Banking Co.

security for the payment of the debenture-bonds of the Investment Company. On November 30th, 1914, the directors of the Banking Company voted to go into voluntary liquidation, and on January 18th, 1915, the court appointed two receivers of this Company, who entered upon their duties and are now so engaged. Subsequently these receivers were duly appointed receivers of the Realty Investment Company.

The Middlesex Banking Company, for the more efficient conduct of its business, very early established a western office at St. Paul, Minnesota, and later in various other States of the West. All these were manned by men who became, through years of contact with the borrowers, very familiar with all the sections where the Company made its loans in the various States; extensive and valuable maps, and much other detailed and technical knowledge of the locality and people with whom the Company was dealing, were accumulated and are now in the possession of the receivers.

The borrowers have always been, to a very large extent, foreign-born, and without bank accounts, and

---

withdrawn; and all the provisions of this agreement shall apply as well to such substituted collateral as to collateral originally deposited."

"Whenever said Banking Company shall surrender to said      any bond issued under this agreement, said shall deliver to said Banking Company such collateral as said Banking Company may select from the collateral deposited for the security of the series to which said bond belongs equal in amount, as counted at the time of deposit, to such surrendered bond, and thereupon said bond shall be canceled by said      and returned to said Banking Company."

"The Banking Company shall at all reasonable times in business hours have the right to inspect the collateral deposited by it under this agreement with said     , and at all reasonable times in business hours the Official Examiner of any State or Territory of the United States shall, upon the written permission of said Banking Company, have the right to inspect the collateral deposited with and held by said      under this agreement."

often with little education; and personal contact with them by the representatives of the Middlesex Banking Company early became an important and an indispensable feature of its western business. These representatives visited the borrowers, kept their farms under observation, saw that the insurance, taxes, and other charges were paid, collected the interest and principal when due, etc. This work should still be done by personal contact, and cannot be effectively done by correspondence, or by strangers. This method of handling the property results in keeping the farms under cultivation, the buildings in repair, the taxes paid, and the lands improved, and the continuance of the arrangement becomes very important for the preservation of the values of the farms, which, if abandoned, deteriorate rapidly, and could only be sold, if at all, at figures which would be disastrous to the holder of the mortgage and would, in most cases, wholly destroy the equity.

All the mortgages, those on the lands of individual borrowers and on the lands of the Realty Investment Company, are still standing of record in the name of the Middlesex Banking Company, and in all cases the borrower knows no other person in the matter than the representative of the Middlesex Banking Company. The recording of the thousands of assignments and the picking out of the papers connected with such loan, held by the trust company, would entail a very large expense (estimated at $1,200 to $2,000 for the recording alone) and a vast amount of clerical work and time. It is only by such record that the trust company could be brought into contractual relations with the borrower. This, too, would leave all other liens still in the name of the Middlesex Banking Company. There would, moreover, then be several differing interests looked after by different parties. Such confusion could

only result in expense and loss, which would be wholly avoided by leaving the care of all these obligations in the hands of the receivers, as it has heretofore been in the hands of the Middlesex Banking Company.

The Middletown Trust Company and the Security Trust Company are local companies having no western organization and no present means of getting in touch with these lands, or with borrowers, and have no first-hand knowledge of the lands or of the tenants, or the borrowers, or with prospective buyers, or conditions generally, while the entire organization of the Middlesex Banking Company and the Realty Investment Company is at the disposal of the receivers, and can be effectively used to conserve and protect the properties until such time as they can be sold to the best advantage. An attempt of either trust company to provide any sort of organization for this purpose would entail a heavy expense which would necessarily fall on the debenture-holders.

The receivers declined to turn over to the trust companies, as such trustees, all papers and records relating to said collateral, or to furnish information regarding it, which they had. Shortly after their appointment a controversy arose as to whether the receivers or the trust companies should collect the interest and principal of the collateral so deposited. The trust companies claimed the right to these papers and information, and to record the assignments in their hands and to collect the collateral and its increment. The receivers denied their right to these, and claimed the right to collect the collateral themselves. All of the parties applied to the court to have it instruct the receivers as to the matters in controversy. The court, after hearing, passed its order, providing, among other things: (1) that the receivers should collect the collateral for the benefit of the debenture-holders; (2) that the

trustees should not record the assignments; (3) that the receivers might make substitutions in the collateral at their discretion; and (4) that they might charge, against the proceeds of the collateral collected, their expenses and a reasonable sum for services, and pay over the balance to the trustees.

*William Waldo Hyde* and *Wesley U. Pearne*, for the appellant (Middletown Trust Company).

*Charles Welles Gross*, for the appellant (Security Trust Company).

*Lewis Sperry* and *Frank D. Haines*, for the appellees (receivers of Middlesex Banking Company).

WHEELER, J. The trial court regarded the important point in this controversy to be whether the receivers or the trustees should collect this collateral. It decided in favor of the receivers upon what it considered the equities of the situation. It found the receivers were not antagonistic in interest to the debenture holders, since their interest in the collateral lay in liquidating it so as to create a surplus beyond the sum required to pay the debenture-holders. Its main reliance was, as is that of the receivers upon this branch of the case, in the fact that the receivers have under their control the organization perfected by the Banking Company through which the collections may be made more efficiently and economically than by the trustees, who at present have neither the facilities, nor the acquaintance, nor the experience, required in the conduct of such a business.

If it were a fact that only the receivers could make use of this organization in collecting this collateral it would affect strongly the equity of the situation. But

such is not the fact. The receivers, by direction of the court, may turn over to the trustees all of this organization, and if this were done the principal basis of the order falls. If this course will benefit the collection of the collateral, the court not only can, but no doubt will, make an appropriate order; indeed, it would then be the duty of the receivers to request such order and, upon proper terms, to facilitate its execution. Then the trustees will be in as good position to collect this collateral as these receivers, so far as this organization can aid; and, aside from this, there is no suggestion in the record from which it may be inferred the receivers can collect the collateral better than the trustees. The reasoning which finds in the equity of the case authority for the court's order, assumes that the trust is existent and the possession of the trustees merely suspended for the benefit of those in interest, and when this benefit is secured the full possession and control will pass again to the trustees.

There is a far more serious question involved than which will prove the better collecting agent, receivers, or trustees. For the receivers claim the court had "plenary authority to make such order as to the control, custody, and administration generally of this trust, not in contravention of vested rights, as the best interests of *cestui que trustent* may, in its judgment, require."

The receivers, as a general rule, can do what the insolvent company could have done; they take its assets burdened with all valid liens and equities against it. *Merwin* v. *Austin*, 58 Conn. 22, 34, 18 Atl. 1029; *In re Wilcox & Howe Co.*, 70 Conn. 220, 231, 39 Atl. 163. The trust companies held this collateral under the trust agreements as trustees for the benefit of the debenture-holders. The mortgages deposited with them constituted a trust fund. The Banking Company

had, until the debenture-holders were paid, no right over this collateral except that of substitution of collateral of equal value. The receivers had no higher right than the Banking Company had. They could not interfere with, nor be given power to interfere with, the vested rights of the debenture-holders in this collateral, nor could they take or be given possession of this collateral until the debentures were fully satisfied.

When a debtor has deposited collateral with a trustee as security for the payment of his debt, the trustee cannot be compelled to surrender to receivers of the insolvent debtor the collateral until the debt is paid. And after default, if the trust be one to apply the proceeds of the collateral for the benefit of the secured creditor, the trustee is entitled to administer the trust as against the receivers of the insolvent. The authorities are in practical agreement in this doctrine and in its application. In *Cooke* v. *Warner,* 56 Conn. 234, 14 Atl. 798, an insurance company had voluntarily deposited with the State treasurer securities in trust for its policy-holders. The company became insolvent, and receivers were appointed. In a suit brought by the receivers claiming these securities, we held that this fund was a trust fund which could not be taken by the receivers from the trustee. *Matter of Home Provident Safety Fund Asso.,* 129 N. Y. 288, 29 N. E. 323; *Matter of Binghamton G. E. Co.,* 143 N. Y. 261, 38 N. E. 297; *Ruggles* v. *Chapman,* 59 N. Y. 163, 165; *Risk* v. *Kansas Trust & Banking Co.,* 58 Fed. Rep. 45; *Fidelity Ins. T. & S. D. Co.* v. *Roanoke Iron Co.,* 81 Fed. Rep. 439; *Real Estate Trust Co.* v. *New Zealand L. & T. Co.,* 93 Fed. Rep. 701; *Brady* v. *Furlow,* 22 Ga. 613. This rule rests upon the inviolability of contracts.

The appellees contend that the trust companies, as the holders of the mere legal title, hold the collateral

subject to the order of the court as to what is for the best interests of (1) the debenture-holders; and (2) the general creditors. This conflicts with the rule universally laid down, that pledged collateral cannot be taken out of the hands of the pledgee by the court, and if the pledge be upon trust to collect the collateral after default and apply the proceeds to the secured debt, the trustee is entitled to administer the trust as against the receiver of the debtor.

The appellees further contend that the order appealed from neither interferes with the vested rights of the trustees in this fund, nor with their possession, since it merely provides the means of liquidating it, and then places it in the hands of the trustees for the benefit of the debenture-holders. Let us see, first, some of the things the trustees agreed to do under the trust agreements. They agreed to act as trustees of this fund, and to hold and administer the collateral in accordance with the terms of their agreements. They agreed to certify as to each debenture upon it. They agreed, upon default, to collect this collateral and apply the proceeds, less their expenses and charge for services. They hold the assignments of the mortgages under agreement not to record them until default is made. Upon default the trustees have the right to perfect their title and thus protect the debenture-holder and carry out the trust. What did the order of the court do? It gave the receivers the right to compel the trustees to deliver to them, the receivers, the possession, for collection, of every mortgage and assignment held by the trustees. This would strip the trustees of the evidences of title to the trust fund. It forbade the trustees to perfect their title by recording the assignments as directed by the trust agreements. It took from the trustees the right of collecting the collateral. It gave the receivers power to deduct from the proceeds of the

collateral the expenses of collection and a reasonable sum for their own services, and then ordered the balance returned to the trustees. It required the trustees to accept other collateral substituted in place of that held by them, as and when the receivers might elect. It practically gave the receivers power to collect at their discretion, by giving them power to compromise claims by consent of the court. During the period of collection the trustees are deprived of the possession vested in them under their trust agreements. When the trustees are prevented from getting the abstracts of title and the necessary papers to facilitate collection, forbidden to record the assignments and to collect the collateral, plainly these are interferences with the trustees in the performance of their trust. When the receivers compromise claims and pay their own expenses and services out of the collected collateral, the collateral is depleted in ways contrary to the trust.

· Whether or not this course will benefit these funds is of no pertinency. The sole question is, does it breach the contract between Banking Company and trust companies? If a court may in this case take property held in trust out of the hands of the trustees, administer it through a receiver, and turn the net proceeds back to the trustees, it may do this in every instance where property is placed in the hands of a trustee to secure a debt. And it would seem to follow that every agreement of lien or pledge may be similarly breached with impunity. The order, in our judgment, impairs the contract created by the trusts.

It is also questionable whether, so far as the absent and unwarned debenture-holders are concerned, this order constituted "due process."

In one part of their brief the appellees say the authority of the trustees under the trust agreement ceased upon the naming of the receivers, and their

authority can be only such as the court may now give them. This method of abolishing a trust is, we think, so new as never to have received judicial approval. A court of equity has control of trusts and trustees; it may, for cause, displace a trustee appointed by contract or otherwise, and name another in his stead. It may not order a receiver to act as and for a trustee. When the trustee is carrying out the trust it may not limit the exercise by the trustee of his powers under his trust agreement; it may restrain an abuse of his power, but it cannot control the exercise of the legal discretion vested in him under the trust agreement.

The receivers further contend that, although the trust agreements provide for a default in the payment of principal and interest and a sale thereafter, the default in contemplation was one to occur while the Banking Company was a going concern and not one occurring after insolvency. They find support for this claim in the terms of the agreements: "but no sale thereof shall be made at a less rate than the face value with accrued interest of said collateral, except upon the written consent of said Banking Company, its successors and assigns"; and in the provision that the trustee "shall not in any case be liable for any act or omission, except for bad faith, in the execution of its trust." From these provisions the receivers insist that the right to sell or collect this collateral never arose, since there was no default prior to the receivership, and no right to sell had then matured, and the receivership suspended the contract between the banking and trust companies.

If it be true that under the trust agreements this collateral was placed in the hands of the trustees without furnishing them the means of protecting the debenture-holders by collection of the collateral upon the insolvency of the debtors, perhaps a court of equity

might give the trustees power to collect. But it could only act upon application to the court to secure its aid in administering the trust. No such application was before the court. Taking the collateral from the trustees and turning it over to the receivers to collect is a very different procedure from that of invoking a court of equity to assist the trustee to administer his trust. The right of the trustee to collect after insolvency was not, upon this theory, suspended; it never arose.

But we think the agreements are not susceptible of this construction. It would be singular if a business of such magnitude and age should make the trust agreements, upon the faith of which the Banking Company's bonds were sold, incapable of affording protection to their holders in the common contingency of insolvency. The nature of the business and the salability of these bonds required such a provision. So long as the Banking Company met its financial obligations, there was no reason why it should not retain the record title to the collateral and collect the income. When it was in default, either as a going or an insolvent concern, it was imperative, in the interest of the debenture-holders, that the trustees should have the power to collect both the income and principal of the collateral. Then the necessity arose for having the right to record the assignments and the right to compel the Banking Company to deliver the abstracts of title and other papers relating to the collateral. The agreements give this power and do not limit the default to that of a going concern; with these broad provisions there was no occasion to specify whether the default referred to was that of a going or an insolvent concern.

But the appellees regard a part only of these agreements. They do provide that sale may not be made at less than the face value with accrued interest, except

upon the written consent of the Banking Company or its assigns. They further provide that in case the trust company "shall fail to make such sale on the aforesaid terms, it shall proceed to collect such collateral in such manner as it shall deem best for the best interests of the holder of the bonds of said series." These provisions may be construed together. So read, we think they provide that the trustee shall, in the first instance, secure the consent of the Banking Company or its assigns, the receivers, and if this is not secured, then the trustee is not confined to a procedure by foreclosure, but may collect the collateral "in such manner as it shall deem best for the best interests of the holder of the bonds." Under this broad power the trustee has the right to compromise claims according to its best judgment as such trustee, using due care and good faith.

The provision for a default upon failure to pay interest or principal for a specified period is not exclusive; a default of necessity occurs immediately upon the Banking Company's becoming insolvent and the appointment of receivers. The theory of the appellees seems to be that the receivers are administering the trust, not acting outside of it. If the trustees may not compromise claims, we do not see how another official, acting under and through the same agreement of trust, may. Sixty per cent of their collateral was deposited under the Columbia Trust Company agreements. The Middletown Trust Company is the successor of the Columbia Trust Company by appointment of the court which named these receivers. Why should a court of equity take the collateral from the trustee of its own choosing, who is without fault, and hand it over to receivers of its choosing, for the purpose of having it collected?

Two cases are the main reliance of the receivers. The first, *Miles* v. *New South B. & L. Asso.*, 95 Fed. Rep. 919, does hold that receivers, under circumstances

such as are present in this case, may, by order of court, take possession of collateral held by a trustee and collect the collateral and hold the same as a separate fund subject to the trust under which the trustee held. We think this case is against authority, and certainly against settled principle. The second, *Girard Trust Co.* v. *McKinley-Lanning L. & T. Co.*, 135 Fed. Rep. 180, held the trust agreement gave the trustee no power to administer the assets in case of, general insolvency; basing this construction chiefly upon the fact that the agreement of trust made no provision for payment to the trustee for its services in administering the trust after insolvency. In this case there is provision for paying the trustee.

There is error, the judgment and order are reversed, and the Superior Court is directed to render judgment in favor of said trust companies in accordance with this opinion.

In this opinion THAYER, BEACH and BENNETT, Js., concurred.

RORABACK, J. (dissenting). As I interpret the order of the court from which this appeal was taken, no attempt is made thereby to substitute the receivers of the Middlesex Banking Company for the original trustees, either as custodians of the pledged collateral before collection, or as custodians of the proceeds thereof after collection, or in the distribution of the proceeds under the terms of the trust contracts. It does not authorize the receivers to take the pledged collateral out of the hands of the trustees, except as may be necessary for the collection of the principal when due; and the receivers are required to return the net proceeds of such collections to the trustees for the account of the bondholders entitled thereto. In the

meantime the trust companies are protected by the receivers' bonds. In other words, the organization maintained and controlled by the receivers is, by order of the court, constituted a bonded collection agency for the trustees, both as to interest and principal, upon a finding by the trial court which conclusively establishes the fact that the trustees must otherwise create some similar agency for that purpose at unnecessary expense either to the bondholders, to the unsecured creditors, or to both.

A proper understanding of the real scope of this order differentiates it very plainly from *Cooke* v. *Warner*, 56 Conn. 234, 14 Atl. 798, where the receivers of an insolvent life insurance company attempted to take the possession, control and distribution of the statutory deposit required of life insurance companies out of the hands of the State treasurer, who was, by the statute, made the trustee of that fund for the benefit of policy-holders. I fully agree with the rule laid down in the cases relied upon by the trustees, that pledged collateral cannot be taken by receivers out of the hands of the pledgee, and that if the pledge be upon trust to see to the application of the proceeds of the collateral after default, the trustee is entitled to administer the trust as against the receivers of the debtor. In my opinion the order in question does not conflict with that rule or with the general principle of the inviolability of contracts which lies behind it.

The finding in this case shows that the ministerial details of the collection of interest and principal cannot, in any event, be attended to by the trustees themselves, and that they must either utilize for that purpose the already existing agency, or create one capable of operating in other States. This order, therefore, leaves the trustees in the custody of the collateral except as it must necessarily be transmitted to third persons in

other jurisdictions for the purpose of collecting the principal; it takes out of their hands the collection of the interest which must, in any case, be collected in part through agents; and it provides proper security for the return of the net proceeds of all collections to the trustees, leaving them to execute the trust so far as it is possible for them to do so at all. No doubt the trustees could, under the terms of the trust, employ the receivers and the organization which they maintain and control to do the very things which the order requires the receivers to do; and the principal question before us is whether a court of equity, conducting a general administration in receivership proceedings, has power to compel the trustees to do so, when the fact is that such a course will result in a large saving for the benefit of either the bondholders, the unsecured creditors, or both.

It seems clear that the order, as I interpret it, does not deprive the bondholders of any contract right, unless it can be said that the order attempts to substitute the discretion and judgment of the receivers for the discretion and the judgment of the trustees in the matter of collection of the collateral. I do not think that under the circumstances of this case the order is open to objection on that ground. An examination of the contracts shows that they leave little room for the exercise of discretionary powers on the part of the trustees. The trustees had nothing to say as to the validity or value of the collateral deposited with them; and they were bound to accept substituted collateral of like contract value whenever tendered by the Banking Company. After default they have no right to sell the collateral (with the exception of the collateral deposited with the Middletown Trust Company under a separate contract or contracts to secure reserve value of so-called income bonds) at less than its face value

with accrued interest, without the consent of the Banking Company, to whose rights in this regard the receivers have succeeded. Upon failure to make sale of the collateral, the trust companies are required to collect the collateral in such manner as they deem best for the interest of the holders of the bonds belonging to the series secured thereby. This provision seems, at first sight, to confer considerable discretionary power; but in view of the prohibition against a sale for less than face value and accrued interest without the consent of the Banking Company or its successors in interest, the right to "collect" should not be construed as including a right to compromise any disputed or doubtful collateral by accepting less than its face value in full payment, without a like consent. The trustees, acting independently, are in effect limited to a collection by foreclosure in case of a breach of condition; or to a collection of interest and principal according to the terms of the debtor's obligation. As to the proceeds of collection, they are trustees, not only for the bondholders, but, in respect of any surplus, for the Banking Company and for the receivers as its successors in interest. The obligation to collect is mandatory, and I think it requires the trustees to collect according to the terms of the debtor's obligation, and does not authorize them, without the consent of the receivers, to waive a default, or, as already stated, to compromise any collateral for less than its face value. In other words, the independent discretionary powers of the trustees under these contracts, when analyzed, are restricted to the manner of collection, and the only possible interest which the bondholders can have in the matter is that the trustees should select the most effective and least expensive method of collection. In these receivership proceedings it is the right and duty of the court to protect the interest, or the possible in-

terest, of unsecured creditors, without impairing the contract rights of secured creditors; and it would be a strange thing if the Superior Court, having jurisdiction over the subject because engaged in a general administration of this estate, could not control the discretion of these trustees as to the manner of collecting the collateral, so far as to prevent them from unnecessarily wasting the trust fund in their hands.

It is suggested that the court, having control of its receivers, should require them to allow the trustees to use, for the purpose of collecting the collateral, the organization which the receivers maintain and control. Undoubtedly the court might have so ordered in the exercise of its discretion. But it has not done so; perhaps because of the possible difficulties which might result from putting three different managements in charge of the organization. Moreover, the trustees have not asked the court to permit them to make use of the receivership, and if they had done so, they must, upon familiar principles, have taken the benefit of the receivership upon such terms as the court, in the exercise of a legal discretion, might see fit to impose. The trustees are standing upon their contract right, and they must face the fact that they cannot be permitted to exercise their contract rights in the manner for which they are contending, without unnecessary impairment of the trust fund, and without actual or possible injury to their *cestuis que trustent*. That being so, I think, as already stated, that the trial court was justified in controlling the exercise of the trustees' discretion in the limited way in which this order does, for the purpose and with the effect of more effectually preserving the rights of the bondholders themselves, as well as of the unsecured creditors.

It is urged that the unsecured creditors cannot possibly have any interest in the collateral because it

does not exceed in value the face of the bonds secured thereby; but the noninterest-bearing collateral was deposited at eighty-five per cent only of its face value, and the income from the interest-bearing collateral is presumably larger than the interest on the bonds issued against it; so that it cannot be said that as a matter of law there is no possible surplus for the unsecured creditors.

Objection is made to other matters contained in the order, some of which are incidental to the principal issue already decided. For example, the order forbidding the trustees to record their assignments of mortgages is a necessary one, when it is once determined that the collateral shall be collected through the receivers; and the same is true of the denial of the trust companies' prayer that the receivers be required to turn over to the trustees all abstracts of title, papers and other memoranda relating to the collateral.

It is said that the order provides for withdrawals and substitutions of collateral in the judgment of the receivers; and that is true, though in a very limited sense, because it is restricted to a substitution of a better security, on the same land, for a worse, and is apparently intended to apply only to those cases where collection in full cannot be made. Nevertheless, the appointment of receivers in general administration of the estate of the Banking Company has all the effect of a default, as defined in the contracts, in fixing the right of the holders of each series of bonds to have the proceeds of the specific collateral, then held by the trustee to protect that series, applied in payment thereof; and I think this paragraph of the order should be modified by inserting a phrase equivalent to that found in paragraph six of the order, so that if any such substitution is necessary, it shall be upon the consent

of the interested trust company, or upon order of the court or a judge thereof.

The ninth paragraph of the order, which is also objected to, was added to enable the receivers to meet unforeseen contingencies; and as limited by its own terms I think it does not purport to confer upon the receivers any general discretionary powers, or any discretionary powers at all, which are larger in character and effect than those above referred to.

With the modifications of the order as suggested, the trustees will be fully protected by the orders of the court.

I think there is no error.